**INTER-MARITIME FORWARDING
CO., Inc.**

v.

**UNITED STATES.**

**C.D. 2242; Protest No. 58/20545.**

United States Customs Court
First Division.

March 16, 1961.

Mollison, J., dissented.

Tompkins & Tompkins, New York City
(Allerton deC. Tompkins, New York City,
of counsel), for plaintiff.

William H. Orrick, Jr., Asst. Atty.
Gen. (Richard E. FitzGibbon trial attor-
ney), New York City, for defendant.

Before OLIVER, MOLLISON, and
WILSON, Judges.

WILSON, Judge.

The issue in the case at bar relates to
the status of and the proper rate of duty
applicable to certain merchandise brought
into the Foreign Trade Zone, port of New
York, Stapleton, N. Y., which, while held
in custody in said zone, was given the
status of "Privileged foreign merchan-
dise" (T.D. 53010). Subsequently, the
merchandise in question was withdrawn
from the Foreign Trade Zone and entered
for consumption at the port of New York.
A portion of the goods was entered for
consumption before the terminating point
of a tariff quota established pursuant to
Presidential proclamation with respect to
merchandise of the character here in-
volved, while another portion of the goods
was entered for consumption after the
tariff quota in question was reached.
The ultimate question for decision is
whether the rate of duty applicable to
the involved merchandise is that in force
and effect at the time a status of privi-
leged foreign merchandise was obtained
and which was obtained during the life
of the quota and while the goods were in
custody in the Foreign Trade Zone, or
whether the proper rate of duty is
predicated upon that which prevailed at
the time the involved merchandise was
entered for consumption at the port of
New York, dependent upon whether said
merchandise was entered for consumption
before or after the tariff quota estab-
lished for such goods was reached.

The merchandise in question consists
of two bales (Nos. 9522 and 9523) of
woven woolen fabrics admittedly subject
to classification under paragraph 1109(a)

of the Tariff Act of 1930, as amended, 19 U.S.C.A. § 1001, par. 1109(a), and, accordingly, subject to a specific rate of duty of 37½ cents per pound and, in addition, an ad valorem duty rate.

A consideration of the present inquiry involves the applicability of the provisions of paragraphs 1108 and 1109(a), as amended by the General Agreement on Tariffs and Trade, T.D. 51802, as follows:

| Tariff Act of 1930, paragraph | Description of products | Rate of duty |
|---|---|---|
| 1108 | Woven fabrics, weighing not more than four ounces per square yard, wholly or in chief value of wool, regardless of value: | |
| |     If the warp is wholly of cotton or other vegetable fiber. | 30¢ per lb. and 25% ad val. |
| |     Other ............... | 37½¢ per lb. and 25% ad val. |
| |     *Note:* The United States reserves the right to increase the ad valorem part of the rate applicable to any of the fabrics provided for in item 1108 or 1109(a) of this Part to 45 per centum ad valorem on any of such fabrics which are entered in any calendar year in excess of an aggregate quantity by weight of 5 per centum of the average annual production of similar fabrics in the United States during the 3 immediately preceding calendar years. | |
| 1109(a) | Woven fabrics, weighing more than four ounces per square yard, wholly or in chief value of wool, regardless of value. | 37½¢ per lb. and 25% ad val. |

The specific issue in this case, as will be hereinafter discussed, involves the proper ad valorem rate of duty applicable to the imported goods under the pertinent paragraph, that is, whether the ad valorem rate of 25 per centum or 45

per centum should be imposed upon the merchandise.

All the essential facts in this case have been stipulated between the respective parties. It is agreed that, on March 14, 1958, the involved bales of woven woolen goods were brought into the Foreign Trade Zone at Stapleton, N. Y., in accordance with section 3 of the Foreign-Trade Zones Act (Public Law 397, 73d Congress (48 Stat. 998–1003; 19 U.S.C.A. §§ 81a–81u), as amended by Public Law 566, 81st Congress, T.D. 52504).

It was further agreed that, in accordance with the reservation attached to paragraphs 1108 and 1109(a) in the trade agreement, T.D. 51802, supra, a Presidential proclamation, dated September 28, 1956 (T.D. 54212), as amended by a proclamation of March 7, 1958 (T.D. 54550), was issued, under which the President of the United States exercised the right to increase the ad valorem rate of duty on merchandise of the type here involved from 25 per centum ad valorem to 45 per centum ad valorem, in the event said merchandise was entered or withdrawn from warehouse for consumption in any calendar year following December 31, 1957, in a quantity in excess of a quota fixed by the President of the United States. Pursuant to said proclamation, as amended, supra, the President, on March 7, 1958, notified the Secretary of the Treasury that for the calendar year of 1958 the quota for fabrics of the kind here involved would be 14,200,000 pounds (T.D. 54551). It was agreed between the parties that, for the purpose of this litigation, said woven woolen fabrics in bale No. 9522 shall be treated as though they were not charged to or included as a part of the 14,200,000 pounds of quota rate fabrics for the calendar year 1958; and that the woven woolen fabrics in bale No. 9523 were not charged to or included as a part of the 14,200,000 pounds of quota rate fabrics for the said calendar year 1958.

It is further stipulated that, on November 20, 1958, the United States Secretary of the Treasury found that the quota quantity of 14,200,000 pounds of woolen fabrics had been reached on July 1, 1958, at 3:25 p. m., eastern standard time. It is also agreed that, on April 16, 1958, while the woolen fabrics in question were still in the Foreign Trade Zone, hereinbefore referred to, the plaintiff-importer filed with the collector of customs at New York an application to have the involved woolen fabrics taken under supervision and given privileged status, which application was duly executed. On May 19, 1958, while said involved merchandise was still in the Foreign Trade Zone at Stapleton, N. Y., the collector of customs liquidated the entry covering said woolen goods and assessed duty thereon at the rate of 45 per centum ad valorem plus 37½ cents per pound. On May 20, 1958, one bale of fabrics (No. 9522), admittedly not previously taken into United States territory and while the tariff rate quota was "in effect" (i. e., 25 per centum ad valorem and 37½ cents per pound), was transferred into customs territory at the port of New York and there entered for consumption and withdrawn, at which time the importer paid to the collector of customs all duties assessed in the liquidation at said liquidated rate of 37½ cents per pound and 45 per centum ad valorem, amounting to $159.08. On July 8, 1958, the remaining merchandise in bale No. 9523 was transferred into customs territory and entered and thereafter withdrawn, at which time the importer paid the collector all duties assessed in the aforesaid liquidation at said liquidated rate of 37½ cents per pound and 45 per centum ad valorem. It was agreed between the parties that said woven woolen fabrics in bale Nos. 9522 and 9523 were not charged to or included as a part of the 14,200,000 pounds of quota rate fabrics for the calendar year 1958. It was also agreed that the plaintiff, before filing its application for privileged status for the involved merchandise was advised of the contents of Bureau circular letter, dated March 3, 1958 (reference C.C. 343.3), which reads, in part, as follows:

"The question has arisen whether privileged foreign status under section 3 of the Foreign Trade Zones Act (19 U.S.C. 81c, 1st proviso) may be granted for woolen textiles ordinarily subject to the quota provisions of T.D. 54212.

"Applications for privileged foreign status for woolen textiles of the type under discussion shall be accepted, but the duties shall be liquidated only at the higher or non-quota rate. If privileged foreign status is granted, the higher rate shall remain applicable to the merchandise if it is transferred to customs territory and entered for consumption at any time in the future.

"In order to avoid misunderstanding or legal consequences not contemplated by the importers concerned, no such application for privileged foreign status which is now pending or which is filed in the future shall be processed until the applicant has been informed that the non-quota rate will be used and will be binding upon the merchandise if it is entered in customs territory at any time thereafter. Every such applicant shall be given an opportunity to withdraw his application for privileged foreign status if he so desires."

Finally, it was expressly agreed between the parties that no issue is here raised concerning the compliance with or failure to comply with any regulation of the Secretary of the Treasury with respect to the transfer and entry of this merchandise.

From the foregoing recital of facts, it may be observed that the privileged foreign merchandise here involved was assessed at the "non" quota rates of 45 per centum ad valorem plus $37\frac{1}{2}$ cents per pound, whether or not it was "entered" during the life of the 1958 quota; and that status as "Privileged foreign merchandise" was obtained during the life of the quota here under consideration and at a time when the 25 per centum ad valorem plus $37\frac{1}{2}$ cents per pound rates were "in effect."

The sole question here involved is one of law. To resolve the issue before us requires an interpretation of the statutes, Presidential proclamations, and departmental regulations applicable to the situation. Furthermore, the real heart of the question is whether the same rule of interpretation applies to what we shall call "quota merchandise" as is applicable to nonquota importations.

The plaintiff argues with some degree of persuasiveness that the language of section 3 of the Foreign-Trade Zones Act is mandatory and that the collector must assess duty upon all privileged goods according to the provisions of that statute at the prevailing rate of duty at the time the application for status is made and accepted.

Said section 3, as amended by Public Law 566, 64 Stat. 246, reads as follows:

"Sec. 3. Foreign and domestic merchandise of every description, except such as is prohibited by law, may, without being subject to the customs laws of the United States, except as otherwise provided in this Act, be brought into a zone and may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this Act, and be exported, destroyed, or sent into customs territory of the United States therefrom, in the original package or otherwise; but when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise: *Provided,* That whenever the privilege shall be requested and there has been no manipulation or manufacture effecting a change in tariff classification, the collector of customs shall take under supervision any lot or part of a lot of foreign

merchandise in a zone, cause it to be appraised and taxes determined and duties liquidated thereon."

The plaintiff emphasizes that portion of the foregoing statute, which states:

"* * * *Provided,* That whenever the privilege shall be requested and there has been no manipulation or manufacture effecting a change in tariff classification, the collector of customs shall take under supervision any lot or part of a lot of foreign merchandise in a zone, cause it to be appraised and taxes determined and duties liquidated thereon."

In connection with said section 3 of the Foreign-Trade Zones Act, the plaintiff cites the following regulation of the Customs Regulations of 1943, as amended, T.D. 53010, which reads as follows:

"[Sec. 30.6(f)]. Privileged foreign merchandise shall be subject to appraisement and tariff classification according to its condition and quantity, and to the rates of duty and tax in force, on the date of the filing with the collector, in complete and proper form for approval, of the request on zone Form B for privileged foreign status and the zone customs entry which is required to accompany it. * * * *"

It may be further observed that subdivision (b) of said section 30.6 provided in part as follows:

"(b) Merchandise within the purview of the first proviso to section 3 of the act, as amended, shall be given status as privileged foreign merchandise on proper application. * * * Upon acceptance of the entry, the collector shall cause the merchandise to be appraised and taxes determined and duties liquidated thereon promptly. The taxes to be determined are those of the same nature as are indicated in the liquidation of entries of imported merchandise in customs territory."

There is no question according to the stipulation that, on April 16, 1958, when the application for privileged status for the goods at bar was filed with the collector, the quota on such merchandise had not yet been filled, and the applicable rate of duty on such woolen fabrics then entered into United States customs territory was 25 per centum ad valorem plus $37\frac{1}{2}$ cents per pound. It is also clear that no reference is made in section 3 of the Foreign-Trade Zones Act, or regulation 30.6(f), supra, relative to quota merchandise. Neither is there any question but that paragraphs 1108 and 1109(a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, reduced the ad valorem rate of duty on woven fabrics to 25 per centum. It must also be conceded that, under the trade agreement, the right was reversed to the United States of America acting through its President "to increase the ad valorem part of the rate applicable to any of the fabrics provided for in item 1108 or 1109(a)," supra, to 45 per centum ad valorem on any of such fabrics subject to the relevant quota provisions.

The Government apparently agrees that "the Foreign Trade Zone Act contemplates freezing an existing single rate of duty for privileged merchandise against future unforeseen changes in that rate by statute or otherwise (unless the provision of law changing the rate includes a specific statement that the change in rate shall prevail over the foreign zone rate)" (Government brief, page 10). The Government maintains, however, that the quota established for woolen fabrics does not provide for a single rate of duty, but, rather, provides for a dual rate, dependent upon the factual situation at the time when the woolen fabrics are entered for consumption. It, accordingly, contends that the rate of duty applicable herein does not depend upon the existence of merchandise in the Foreign Trade Zone with privilege status, but rather upon the time when the merchandise subject to the quota provisions is *entered or withdrawn* for consumption.

The importer argues that the reservation in paragraph 1108 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, and the

Presidential proclamations cannot alter the express provisions of section 3 of the Foreign-Trade Zones Act. It is further contended that merchandise in the foreign trade zone is not entered and is not chargeable against any quota, and that the 45 per centum rate was not in effect when the bales were liquidated. The importer, in its grief, further contends that long-continued practice on the part of the customs service bears out the plaintiff's contention and that legislative history shows that the duty applicable at the time privilege is applied for remains constant and must be the duty assessed at the time the goods are entered in United States customs territory.

The defendant contends that the merchandise was properly assessed at the 45 per centum ad valorem rate, maintaining that 45 per centum under the provisions of paragraph 1109(a) of the Tariff Act of 1930 was the applicable ad valorem rate, unless the merchandise was *entered* for consumption prior to the fulfillment of the quota for such merchandise. The Government also argues that the administrative procedure followed by the collector of customs is based on the theory that the woolen textile proclamation of the President in effect provides for two rates of duty, the lower or quota rate being applicable under certain conditions, and the higher rate to be applied when such conditions are not met.

It is obvious that a practical difficulty confronts the Government on the application of the provisions of section 3 of the Foreign-Trade Zones Act. If the contentions of the plaintiff are upheld, then importers are in a position to rush such quantities of quota merchandise into the privileged zone as they desire prior to the actual filling of the quota on merchandise entered into the customs territory, and then withdraw the privileged merchandise in untold quantities after the quota has been filled.

It appears to the court that, in construing section 3 of the Foreign-Trade Zones Act, it must be read in connection with the foreign trade agreement here involved and with the reservation applicable to merchandise such as here imported, together with the customs departmental regulations and published instructions. Viewed from that angle, it appears that the plaintiff-importer clearly had in mind ignoring the quota limitations on woolen fabrics by entering its merchandise into the privileged zone before the quota had been reached and bringing it into the customs territory later at the lower rate after the quota had been passed. This fact really appears from the pretrial conferences in this case.

If section 3 of the Foreign-Trade Zones Act is considered in the light of the trade agreement with the reservation, departmental regulations, and the departmental letter, the proper interpretation, in our opinion, would be that the impact of the trade agreement with its reservations and the departmental regulations on said section 3 is to modify the latter to the extent that it is not arbitrarily controlling as to the quota goods in question, specifically in the determination of the proper rate of duty applicable to the involved merchandise.

As heretofore noted, Presidential Proclamation No. 3160, dated September 28, 1956 (91 Treas.Dec. 351, T.D. 54212), issued pursuant to the "note" contained in paragraph 1108 of the Tariff Act of 1930, as amended, supra, establishing a quota on woolen fabrics such as here under consideration, and Presidential Proclamation No. 3225, dated March 7, 1958 (93 Treas.Dec. 95, T.D. 54550), amending proclamation No. 3160, supra, together with the President's letter of notification, dated March 7, 1958 (93 Treas.Dec. 97, T.D. 54551), specifying the quantity of woolen textiles subject to the quota rate in 1958, all provided that the quota rate shall be applicable only to woolen textiles "entered, or withdrawn from warehouse, for consumption" up to the specified quantity. At the time application under section 3 of the Foreign Trade Zones Act (48 Stat. 998), as amended by Public Law 566, 81st Congress, chapter 296 of the laws of 1950 (64 Stat. 246), for privileged status of

the involved merchandise in the foreign trade zone was made and granted, the applicable ad valorem rate of duty for the fabrics in question was 45 per centum ad valorem unless, in accordance with the provisions of the reservation contained in paragraph 1108 of the tariff act, as amended, supra, the merchandise was entered for consumption prior to the fulfillment of the quota for such merchandise. Here, when privileged status for the merchandise was obtained, the importer could not have received benefit of the lower quota rate, no entry of the goods for consumption having been made. The "condition" entitling the goods to the lower rate of duty, namely, entry of the merchandise for consumption so as to bring the involved goods within the concession granted as to a lower rate of duty for quota merchandise, had not been met, the importer exercising an option to place the goods in the trade zone and obtain privileged status. Concededly, application for privileged status is not an entry for consumption. Merchandise given privileged status in the foreign trade zone may never be brought into the customs territory of the United States.

The collector in the case at bar liquidated the involved merchandise at the ad valorem rate of 45 per centum, which was the only rate at which he could properly liquidate these goods. The privileged status was granted at the higher rate, thus guaranteeing the importer against unforeseen future increases in duty while such goods remained in the trade zone, while at the same time protecting Government revenue on such merchandise not entered for consumption so as to obtain the benefit of the quota concession.

■ The importer argues that a fixed rate of duty attaches to privileged merchandise. The Government, as noted, also is apparently in agreement that a fixed rate of duty does attach to ordinary merchandise given the status of privileged goods. However, the quota established for woven woolen fabrics provided not for a single rate of duty, as in the case of ordinary merchandise, but set up a dual rate of duty dependent upon the status of the merchandise when such woolen fabrics were *entered for consumption,* and the applicable rate for the involved merchandise was not dependent upon the mere fact that the goods were in the foreign trade zone with privileged status.

■ *Counsel for the plaintiff, in its* brief, contends that the action of the collector in here relying upon the "wool quota reservation" contained in paragraph 1108 of the tariff act, as amended, supra, and assessing duty upon the involved merchandise at the higher ad valorem rate of 45 per centum was "improper, illegal, null and void." The basis for this contention is that the Foreign-Trade Zones Act, having been passed by Congress, is the "supreme law of the land" and that the wool quota reservation is merely part of an agreement made by the President with several foreign countries, thus maintaining, in effect, that the Foreign-Trade Zones Act takes precedence and is absolutely controlling in the determination of the proper rate of duty applicable to the merchandise under consideration. We are not in agreement with such a construction of the applicability of the Foreign-Trade Zones Act and the aforesaid wool quota reservation. Our appellate court has recently held that the Trade Agreements Act of 1934, under which the General Agreement on Tariffs and Trade was negotiated and promulgated, was a proper delegation of congressional power to the President. Star-Kist Foods, Inc. v. United States (Bruno Scheidt, Inc., Party in Interest), 275 F.2d 472, 47 CCPA 52, C.A.D. 728, decided December 15, 1959. Accordingly, the Trade Agreements Act of 1934 and the trade agreements made pursuant thereto, specifically here the General Agreement on Tariffs and Trade, are a part of the supreme law of the land. As such, their provisions are pertinent in the determination of the proper rate of duty to be applied to the goods at bar.

For the reasons heretofore advanced, we are of the opinion and hold that the merchandise here involved is properly dutiable under paragraph 1109(a) of the

Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, T.D. 51802, as woven woolen fabrics at the rate of 37½ cents per pound and 45 per centum ad valorem, as assessed.

The protest herein is overruled.

Judgment will be entered accordingly.

MOLLISON, Judge (dissenting).

The issue in the case at bar is whether the quota or nonquota rate under paragraphs 1108 and 1109(a), Tariff Act of 1930, as modified by the Presidential proclamation relating to the General Agreement on Tariffs and Trade, T.D. 51802, is to be used in the liquidation and payment of the duties on merchandise as to which privileged status was secured under the first proviso to section 3 of the Foreign-Trade Zones Act, as amended (19 U.S.C. § 81c, 19 U.S.C.A. § 81c), at a time when an annual import quota had not been filled.

In the determination of the issue, the majority has adopted the view of the defendant, that is to say, that because the merchandise was not, at the time privileged status was secured, being *then* "entered, or withdrawn from warehouse, for consumption," it was not entitled to be liquidated at the quota rate, although the quota at that time had not been filled. I do not agree with this view, nor do I agree with the view taken by the plaintiff that the Foreign-Trade Zones Act and the regulations promulgated pursuant thereto required liquidation and payment of duties at the quota rate regardless of whether the quota had been exhausted at the time when the merchandise actually entered the United States.

I agree with the majority in its view that in the disposition of this matter the Foreign-Trade Zones Act must be read in connection with the Trade Agreements Act and the proclamations issued thereunder in order properly to arrive at the intent of the legislature with respect to the rates of duty to be applied to quota merchandise.

It is clear that the first proviso to section 3 of the Foreign-Trade Zones Act was intended to give to importers who complied with its provisions the benefit of the rates of duty in force and effect at the time privileged status was secured. In my view, however, that means that such importers were to be saved from the effects of future changes in tariff rates which might be made by *legislative action* or by *Presidential proclamation subsequent* to the time when the privileged status was secured. It was not intended to "freeze" any rates which were, at the time the privileged status was secured, subject to future change by reason of the filling of annual quotas or the passage of time, which rates and which changes had *previously* been fixed by legislative action or by Presidential proclamation.

It might be made to appear, from a very strict, literal reading of the Foreign-Trade Zones Act, as amended, *alone*, that what is required thereby is the unconditional adoption of the precise rate of duty which is in effect at the time of filing the proper papers with the collector to secure privileged status. This is, in fact, just what the plaintiff claims in this case.

However, it must be kept in mind that the Foreign-Trade Zones Act and the Trade Agreements Act and its various amendments and extensions, and the proclamations issued thereunder (including that relating to the General Agreement on Tariffs and Trade, which is directly involved in this case), must be read together, and, if possible, interpreted so as to avoid conflict with each other.

Having done this, I conclude that it was not the intention of the act later in date, the Foreign-Trade Zones Act, to repeal or nullify the provisions of the earlier acts or the proclamations issued thereunder, and, specifically, I do not think that any of the acts or proclamations involved contemplated that the benefit of the reduced quota rates should be extended to any merchandise which is not actually "entered, or withdrawn from warehouse, for consumption" at the time the reduced quota rates are in effect.

The reduced quota rate applicable to wool such as that at bar, as set forth

in the Presidential proclamation relating to the General Agreement on Tariffs and Trade, reported in T.D. 51802, and quoted in the majority opinion, is specifically and expressly, by the terms of the proclamation itself, made applicable only to merchandise which has been entered, or withdrawn from warehouse, for consumption.

At the conclusion of the recitals in the said proclamation, the announcement sets forth that—

" * * * I, Harry S. Truman, President of the United States of America, to the end that said trade agreement may be carried out and acting under the authority of the said sections 304 and 350 of the Tariff Act of 1930, as amended, *do hereby proclaim * * * such modifications of existing duties* and other import restrictions of the United States of America and such continuance of existing customs or excise treatment of articles imported into the United States of America *as are specified or provided for in* parts I, II and III, annexes D, H, and I, and part I of, *and the general notes in,* schedule XX of said general agreement * * *."  [Italics added.]

Paragraph 3 of the general notes in schedule XX reads as follows:

"3. Wherever in this Schedule the word 'entered' is used in any quota or seasonal-rate provision, it shall mean 'entered, or withdrawn from warehouse, for consumption.' "

Quite obviously, therefore, it was intended to apply the reduced quota rate only to merchandise which was actually entered, or withdrawn from warehouse, for consumption, and I am satisfied that it was not the purpose of the Foreign-Trade Zones Act to make any change in this intention.

The constructions of the laws sought here by both the plaintiff and the defendant must result in a frustration of one law or the other. The construction sought by the plaintiff would nullify that part of the Presidential proclamation re-

lating to the general agreement which extends the reduced quota rate only to merchandise which has been entered, or withdrawn from warehouse, for consumption. The construction sought by the defendant would nullify that part of the proclamation which extends the reduced rate to merchandise which has been actually entered, or withdrawn from warehouse, for consumption prior to the time when the quota was exhausted, and would also nullify that part of the Foreign-Trade Zones Act which requires liquidation of the duties on privileged merchandise on the basis of the rates in effect at the time privileged status is secured.

I believe that there is a way both laws may be construed to be in harmony with each other and which assures the benefits of both laws to all parties.

It is a familiar device of tariff legislation to accord reduced rates of duty, or even free entry, to imported merchandise upon the condition of the happening of some act or event in the future. It is my view that what was intended by the laws here in question, when read and construed together, calls for the application of such treatment to the quota situation in respect of merchandise which has secured privileged status under the Foreign-Trade Zones Act.

In other words, a procedure which would have been correct under all the laws in question would have been to liquidate the zone customs entry at the reduced quota rate as to both bales involved, subject to the conditions that, prior to the expiration of the quota, the merchandise (1) be sent into customs territory, and (2) the duties so liquidated be paid.

As to all merchandise concerning which the two conditions were not met prior to the expiration of the quota, payment would be required to be made, under the same liquidation, at the nonquota rate when, or if, the merchandise was sent into customs territory.

As indicated in Bureau of Customs circular letter, dated March 3, 1958 (reference C.C. 343.3), referred to in paragraph

(9) of the stipulation herein, the plaintiff's woven woolen fabrics were assessed with duty at the nonquota rates of 45 per centum ad valorem plus 37½ cents per pound *whether or not* the said merchandise was "entered" during the life of the 1958 quota. Bale No. 9522 was assessed by the collector at the higher, nonquota, rate at a time when the quota had *not* been exhausted, even though bale No. 9522 had a status as "privileged foreign merchandise" and, having met the conditions of entry into customs territory and payment of duties, was entitled to the benefit of the lower trade agreement quota rate.

In conformity with the departmental or Bureau circular letter, referred to above, the collector of customs denied the plaintiff the benefit of the reduced quota rate as to the woven woolen fabrics in bale No. 9522. The collector arbitrarily and unlawfully applied the higher nonquota rate to the plaintiff's goods and gave to some other importers (i. e., those who entered or withdrew their goods from warehouse for consumption) the benefit of the lower quota rate, while denying the plaintiff the benefit of the same rate, thus depriving the plaintiff of the equal protection of the laws and, likewise, due process of law as required by the fifth amendment to the Constitution.

By the aforesaid action, the plaintiff was likewise deprived of the benefit of the Foreign-Trade Zones Act and the privileged status of merchandise under the said statute and the regulations made and promulgated thereunder. Cf. Truax v. Corrigan, 257 U.S. 312, 332, 333, 339, 42 S.Ct. 124, 66 L.Ed. 254. See also Iowa-Des Moines National Bank v. Bennett, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265.

For the foregoing reasons, I would support a judgment in favor of the plaintiff in respect of the merchandise contained in bale No. 9522, and in favor of the defendant in respect of the merchandise contained in bale No. 9523. To the extent indicated, I therefore dissent from the decision and judgment rendered by my colleagues.